## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONTINENTAL RESOURCES, INC.,<br>P.O. Box 269000<br>Oklahoma City, OK  73126 | ) ) ) ) | |
|       Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| DAVID BERNHARDT,<br>in his official capacity as Secretary of the<br>United States Department of the Interior,<br>1849 C. Street N.W.<br>Washington, DC  20240; | ) ) ) ) ) ) | |
| THE UNITED STATES DEPARTMENT<br>OF THE INTERIOR,<br>1849 C Street, N.W.<br>Washington, DC 20240; and | ) ) ) ) ) | |
| KIMBRA DAVIS,<br>in her official capacity as Director of the<br>Office of Natural Resources Revenue of the<br>United States Department of the Interior,<br>1849 C. Street N.W., MS 5134<br>Washington, DC 20240, | ) ) ) ) ) ) ) | |
|       Defendants.<br>_____ | ) ) ) | |

## **COMPLAINT**

This case is similar to two cases previously heard and ruled upon by United States

District Judge Randolph D. Moss of this Court:  *Continental Resources, Inc. v. Gould*, Case No.

1:14-cv-00065-RDM [Doc. 93], 410 F.Supp.3d 30 (D.D.C. Oct. 3, 2019) ("***Continental I")***

(copy of decision attached as **Exhibit A**) and *Continental Resources, Inc. v. Bernhardt, et al.*,

Case No. 1:17-cv-02197-RDM [Doc. 58] (D.D.C. Oct. 3, 2019) ("***Continental II***").

Plaintiff Continental Resources, Inc. ("**Plaintiff**" or "**Continental**") hereby brings this

action against Defendants David Bernhardt, as Secretary of the United States Department of the Interior (as "**Secretary**"), the United States Department of the Interior (the "**Department**"), and Kimbra Davis, as Director of the Office of Natural Resources Revenue (as Director of "**ONRR**") (collectively, "**Defendants**") (Continental and Defendants, as the "**Parties**") under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("**APA**").

Through this action, Continental respectfully challenges Defendants' May 24, 2016 Order to Perform Restructured Accounting (Case No. 13-00418, the "**Order**"), the monetary obligations of which (where the principal amount is $10,000 or more) were formally deemed affirmed on April 24, 2020, by decision of the Interior Board of Land Appeals (the "**Board**"), acting on behalf of the Secretary (Case No. IBLA 2016-235, the "**Decision**"), following a failure of the Board to issue a decision within the 33-month period under 30 U.S.C. § 1724(h).

Like *Continental I* and *II*, this case principally concerns Defendants' Decision to value for federal royalty purposes Continental's sales of <u>unprocessed gas</u> to Hiland Partners, LP ("**Hiland**"), as if they were non-arm's-length, by using the <u>processed gas</u> valuation benchmarks, 30 C.F.R. § 1206.153(c) (2016)[1] ("**Section 153(c)**") and specifically the second benchmark, 30 C.F.R. § 1206.153(c)(2) ("**Section 153(c)(2)**"), notwithstanding the fact Hiland's processed gas sales were at arm's-length.   In *Continental I* and *II*, the Court set aside and remanded Defendants' prior decisions for previous time periods, which had reached the same conclusion (and were governed by the same regulations as this case here):

> The Director's determination that the royalties that Continental owes the government must be calculated under Section 153(c)(2) cannot be squared with the plain language of the valuation regulation.  . . .  In short, both the language and purpose of Section 153(c) have no bearing on a case, like this one, where the

---

[1] Throughout this Complaint, we have cited to the 2016 version of the regulations, unless otherwise indicated.

> government contends that the sale of the unprocessed gas to the processor was not
> at arm's length, but where there is no dispute that the sale of the processed gas
> was at arm's length.

*Continental I*, 410 F.Supp.3d at 36.   After *Continental I* and *II* were decided, Defendants represented to the Board in recent briefing during Continental's administrative appeal of the Order that the Court in *Continental I* and *II* determined Section 153(c) was "ambiguous," thus requiring ONRR on remand to merely "explain how Section 153(c) [] applies":

> Judge Moss opined that ONRR's valuation regulation is ambiguous and it should consider what other provisions could apply to value Continental's gas and, accordingly, determined remand was proper. . . . As already stated, Continental I and II require ONRR, on remand, to explain how Section 153(c) – applies to Continental's allegedly non-arm's-length sale of unprocessed gas and consider what other provisions could apply to value Continental's gas.

*Continental Resources, Inc.*, IBLA-2016-235 (copy of briefing attached as **Exhibit B**).

Through this action, and pursuant to the APA, 5 U.S.C. § 706(2)(A)-(F), Continental respectfully requests the Order and Decision be declared unlawful, reversed, vacated, and/or set aside.  Additionally, and pursuant to the APA, 5 U.S.C. § 706(1), Continental requests the Court compel Defendants to reconsider and/or withdraw the Order and Decision by properly following the Court's recent holdings in *Continental I* and *II*.

## JURISDICTION AND VENUE

1.      Continental challenges Defendants' May 24, 2016 Order (Case No. 13-00418), the monetary obligations of which (where the principal amount is $10,000 or more) were formally deemed affirmed by the Secretary by Decision, dated April 24, 2020 (Case No. IBLA 2016-235), due to a failure of Board to issue a decision within the 33-month period under 30 U.S.C. § 1724(h).

2.      The Order and Decision are not subject to further appeal within the agency.  The

- 3 -

Decision constitutes the final action of the Department. *Continental Resources, Inc. v. Jewell*, 846 F.3d 1232, 1233-34 (D.C. Cir. 2017).

3.    Continental has suffered legal wrong from and is adversely affected and/or aggrieved by the Order and Decision within the meaning of 5 U.S.C. § 702.

4.    This action arises under the APA, the Mineral Leasing Act of 1920 (30 U.S.C. §§ 181, *et seq.*), the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. §§ 1701-1759), as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (Pub. L. No. 104-185, 110 Stat. 1700), the federal royalty regulations of the ONRR (30 C.F.R. Parts 1200-1299 (2016)), and the Due Process Clause of the Fifth Amendment to the United States Constitution.

5.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §§ 2201-02 (declaratory relief).  An actual controversy exists between the Parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  By operation of the APA, Congress has waived the sovereign's immunity from suit.

6.    Venue is proper for Continental's royalty claims under 28 U.S.C. § 1391(e)(1)(A) because the Defendant federal officers and agencies reside in this district.  Venue is also proper for Continental's royalty claims under 28 U.S.C. § 1391(e)(1)(B) because a substantial portion of the challenged decision-making occurred in this district.

### PARTIES

7.    Plaintiff Continental is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.

8.    Defendant David Bernhardt is Secretary of the Department and is sued in his official capacity.

9.     Defendant Department is a federal executive department of the United States government.

10.     Defendant Kimbra Davis is Director of the ONRR and is sued in her official capacity.

**OVERVIEW**

11.     Continental is a crude oil and natural gas exploration and production company with significant operations in the Bakken Field of North Dakota and Montana.

12.     Continental is now (and at all relevant times during the period of January 2009 through May 2016 (the "**Relevant Time Period**") was) a lessee under various Department-administered federal leases, including those specifically identified in the Order -- Agreement Number M 90758X (containing 27 federal leases located in Bowman and Slope Counties, North Dakota, which Continental commonly refers to as the "**Cedar Hills Unit**") and Lease Number 284-071447-0 (containing the federal Faris USA 1 well located in Bowman County, North Dakota, as the "**Lease**") (collectively with all other federal leases from which Continental sold gas to Hiland during the Relevant Time Period, as the "**Properties**").

13.     Continental, as the holder of the leases, pays royalties on federal production from the Properties for all gas removed and sold.  Throughout the Relevant Time Period, Continental calculated, reported, and paid federal royalties on production sold from the Properties under 30 C.F.R. § 1206.152 ("**Section 152**") based on prior audits and its belief it was selling unprocessed natural gas from the Properties at arm's length to Hiland.

14.     As affirmed by the Decision, the Order generally orders Continental to report and pay additional royalties, plus interest, in accordance with Section 153(c)(2) and without deductions for transportation and processing allowances on natural gas produced and sold to

Hiland during the Relevant Time Period.

15.     As affirmed by the Decision, the Order specifically orders Continental "to report and pay additional royalties of $86,637.04 for Agreement Number M 90758X and $2,807.59 for Lease Number 284-071447-0," plus interest, and "perform restructured accounting and report and pay any additional royalties," without deductions for transportation and processing allowances, for the Relevant Time Period in accordance with seven issues for the Cedar Hills Unit, four issues for the Lease, and six corrective actions for the Properties.

16.     In principal part, the Decision errs by ordering Continental to calculate, report, and pay federal royalties on production sold from the Properties throughout the Relevant Time Period under Section 153(c)(2).

17.     The Decision specifically errs by comparing (and conflating) Continental's proceeds from its sale of <u>unprocessed</u> gas with Hiland's proceeds from its sales of <u>processed</u> "residue gas" and "plant products."  This comparison is directly contrary to *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 673-74 (D.C. Cir. 2003) (the leaseholder's affiliate is not "the lessee" under the valuation rules for natural gas).

18.     Residue gas and plant products are manufactured by processing unprocessed gas. The Department's royalty regulations value products manufactured by processing differently from how they value unprocessed gas.  *See* Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230 (Jan. 15, 1988) (codified at Section 152 (unprocessed gas) and Section 153 (processed gas)).  Based on the record here, the Department's Decision to compare sales of dissimilar products is unlawful, arbitrary, and capricious.

19.     Due to failure of the Board to issue a decision within the 33-month period under 30 U.S.C. § 1724(h), the Secretary was deemed to have issued and granted a decision: (a) in

favor of Continental as to (i) nonmonetary obligation(s) asserted in the Order and (ii) monetary obligation(s) asserted in the Order, the principal amount of which was less than $10,000; and (b) in favor of the Secretary as to monetary obligation(s) asserted in the Order, the principal amount of which was $10,000 or more.

20.     Continental challenges the Order as well as the Decision issued and granted in favor of the Secretary as to monetary obligation(s) asserted in the Order, the principal amount of which was $10,000 or more.

21.     The Department may rely only on the rationale it gave in the Decision.  *Clean Air Council v. Pruitt*, 862 F.3d 1, 11 (D.C. Cir. 2017).

22.     Even if the Department were free to raise new rationale here, the Decision and Order still suffer from at least six fundamental errors, as described in the following paragraphs.

23.     *First*, the Decision determined Continental must value its unprocessed gas sales from the Properties to Hiland during the Relevant Time Period under Section 153(c)(2) because ONRR thought Continental was affiliated with Hiland under 30 C.F.R. § 1206.151 ("**Section 151**").  The administrative record does not support a finding that Continental was affiliated with Hiland throughout the Relevant Time Period.  The Decision is arbitrary, capricious, and misapplies procedure required by law under Section 151.

24.     *Second*, even assuming *arguendo* Continental's sales transactions with Hiland during the Relevant Time Period were non-arm's-length, the Decision still errs by ordering Continental to value its unprocessed gas sales to Hiland from the Properties during the Relevant Time Period by using the processed gas valuation benchmarks under Section 153(c).  The Parties do not dispute Continental's buyer (Hiland) sold processed gas at arm's length throughout the Relevant Time Period.  In *Continental Resources I* and *II*, similar cases where there was no

dispute Continental's buyer sold processed gas at arm's length, the Court held the Director of ONRR's valuation of Continental's unprocessed gas for royalty purposes under the Section 153(c) "misconstrued [ONRR's] regulations and applied the wrong valuation method." *See Continental Resources I,* 410 F.Supp.3d at 35.  The Court suggested, "Applying those provisions that address . . . *unprocessed* gas at least makes sense" (italics in original)."  *Id.* at 37.  The provisions that address unprocessed gas are found in Section 152.  The Decision unlawfully withholds and/or unreasonably delays adherence with the rulings of *Continental I* and *II* and is otherwise not in accordance with law.

25.  *Third*, even assuming *arguendo* Continental's sales transactions with Hiland during the Relevant Time Period could be properly valued under Section 153(c), the Decision still errs by ordering Continental to value its unprocessed gas for royalty purposes under Section 153(c)(2), the second benchmark of the processed gas valuation regulations.  ONRR arbitrarily and capriciously refused to consider comparable contracts provided by Continental as relevant evidence of its compliance with the first benchmark, 30 C.F.R. § 1206.153(c)(1) ("**Section 153(c)(1)**").  The Decision is arbitrary, capricious, and without observance of procedure required by law.

26.  *Fourth*, in order for the Secretary to make a "demand" for underpaid royalties, Congress required the Secretary to issue an order that (i) asserts a "specific, definite, and quantified obligation claimed to be due," (ii) "specifically identifies the obligation by lease, production month, and monetary amount" and the reasons for claiming the obligation is due, and (iii) provides the lessee "a reasonable basis" to conclude the obligation in the demanded amount is due.  *See* 30 U.S.C. §§ 1702(23), 1702(26), 1724(b)(1).  At most, only Corrective Action No. 1 in the Order qualifies as a "demand."

27.     *Fifth*, Congress also established a seven-year statute of limitation on royalty collection.  30 U.S.C. § 1724(b)(1).  The Order was untimely issued.  Defendants are barred from pursuing all Corrective Actions and all Issues identified in the Order that concern obligations arising before May 25, 2009.  At most, except for Corrective Action No. 1 in the Order, Defendants are barred from pursuing any Corrective Action or Issue identified in the Order for failure to issue a proper "demand."

28.     *Sixth*, Congress also defined a limited set of circumstances under which the Secretary could toll (or extend) the seven-year statute of limitations – one being the receipt and appeal of an "order to perform restructured accounting."  *See* 30 U.S.C. § 1724(d)(4)(A)(ii).  However, as relevant here, Congress specified the Secretary may only issue such an order (i) "within a reasonable period of time from when the audit identifies the systemic, reporting errors" and (ii) if she "specif[ies] the reasons and factual bases for such order."  *Id.* § 1724(d)(4)(B)(ii)(I), (II).  The Secretary may only issue such an order when she "determines during an audit of a lessee . . . that the lessee . . . should recalculate royalty due on an obligation based upon . . . finding that the lessee . . . has made identified underpayments or overpayments which are demonstrated by the Secretary . . . to be based upon repeated, systemic reporting errors for a significant number of leases or a single lease for a significant number of reporting months with the same type of error which constitutes a pattern of violations and which are likely to result in either significant underpayments or overpayments."  *Id.* § 1724(d)(4)(B)(i).  At most, except for the claim that Continental and Hiland were affiliates prior to December 2009 (thereby rendering their transactions non-arm's-length), the Order (i) fails to specifically identify any other systemic, reporting error and (ii) fails to specify reasons and factual bases for the Order.  As a result, the Order was unlawfully issued and does not toll (or extend) the seven-year statute

of limitations.

## SALES TRANSACTIONS

### *Faris Purchase Contract*

29.     On June 1, 1999, Wyoming Resources Corporation (the previous owner and operator of the Faris USA 1 well under the Lease) entered into a Gas Purchase Contract with Continental Gas, Inc. ("**CGI**," now Hiland) for the sale and purchase of production from the Faris USA 1 well within the Lease (the "**Faris Purchase Contract**").

30.     Under the Faris Purchase Contract, CGI purchased and took title to the unprocessed gas at the wellhead meter.  As full consideration for the gas and all components thereof, CGI agreed to pay Wyoming Resources 50% of the weighted average selling price received by CGI for all gas sold from its Badlands Gas Processing Plant (the "**Badlands Plant**"). The gas stream delivered to CGI was commingled, and CGI delivered the total gas stream to its Badlands Plant.

31.     In July 2004, CGI was sold to Mr. Harold Hamm, who merged CGI into Hiland, along with some assets from Hiland Partners, LLC.

32.     On April 10, 2008, Wyoming Resources Corporation assigned 100% of its interest in the Faris USA 1 well to Continental.

### *Cedar Hills Purchase Contract*

33.     On November 8, 2005, Continental entered into a Gas Purchase Contract with Hiland for the sale and purchase of production from the properties covered by the Cedar Hills Unit (the "**Cedar Hills Purchase Contract**").

34.     Under the Cedar Hills Purchase Contract, Hiland purchased and took title to the unprocessed gas at the wellhead meter.  As full consideration for the gas and all components

thereof, Hiland agreed to pay Continental 50% of the proceeds Hiland received for the sale of residue gas and plant products, less certain fees.  The gas stream delivered to Hiland was commingled, and the total gas stream was delivered to Hiland's Badlands Plant for processing by Hiland.

35.     On April 24, 2007, Continental and Hiland amended the Cedar Hills Purchase Contract to reflect their resolution of a disagreement over the plant allocation methodology.

*Both Purchase Contracts*

36.     Throughout the Relevant Time Period, Continental sold all of its unprocessed gas produced from the Faris USA 1 well of the Lease and from the Cedar Hills Unit to Hiland pursuant to the Faris Purchase Contract and Cedar Hills Purchase Contract, respectively.

37.     The Order, as affirmed by the Decision, does not dispute the Faris Purchase Contract and Cedar Hills Purchase Contract were originally negotiated and executed at arm's-length between two third parties.

38.     The terms and pricing methodology of the Faris Purchase Contract and Cedar Hills Purchase Contract are equivalent.

39.     Throughout the Relevant Time Period, Hiland took title to unprocessed gas at the wellhead meters.  The gas was commingled with production from other wells, and the total commingled gas stream was delivered to the Badlands Plant.  Hiland processed the gas it purchased from Continental (and from other producers) and sold the residue gas and plant products to Rainbow Gas Company and SemStream, L.P.  Both sales were at arm's length. Continental was not a party to Hiland's arm's-length sales of residue and gas plant products.

*Additional Purchase Contracts*

40.     During the Relevant Time Period, Continental also sold unprocessed gas to

Hiland from the Properties, excluding the Cedar Hills Unit and the Lease (Faris USA 1 well), pursuant to various other gas purchase agreements, including those originally at issue in *Continental I* and *II*. Hiland took title to the unprocessed gas at or near the wellhead meters. The gas was generally commingled with production from other wells, and the total commingled gas stream was delivered to a gas processing plant. Hiland processed the gas it purchased from Continental (and generally from other producers) and sold the residue gas and plant products. Continental believes each of Hiland's sales of residue gas and plant products were at arm's length during the Relevant Time Period, although Continental was not a party to Hiland's sales of residue and gas plant products.

## GOVERNING STATUTORY AND REGULATORY PROVISIONS

41.    Under the Mineral Leasing Act of 1920 (30 U.S.C. §§ 181, *et seq.*), the Department issues and administers gas leases on federal lands. Under such leases, private companies sell gas production directly, and the government charges the lessee royalties based on the "value of the production" removed or sold from the leased lands. 30 U.S.C. § 226(b)(1)(A).

42.    Pursuant to these statutes, ONRR promulgated regulations establishing methods for determining the "value of production" for royalty purposes. *See* Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230 (Jan. 15, 1988) (codified at Section 152 (unprocessed gas) and Section 153 (processed gas)).

43.    These regulations value gas based on different methodologies depending on certain qualities of the gas at issue – most importantly whether the gas is processed or unprocessed and the identity of "the particular entity to whom producers first sell the gas." *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 673-74 (D.C. Cir. 2003).

44.    Section 151 applies to determine whether transacting parties are "affiliates" and

whether they have "opposing economic interests regarding [a] contract." An "[a]rm's-length contract means a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract." 30 C.F.R. § 1206.151.

45.    "Affiliation" is determined based on percentage of "ownership or common ownership." 30 C.F.R. § 1206.151. Where "ownership or common ownership" is between "10 through 50 percent," control is determined by five factors. *Id.*

46.    Where "ownership or common ownership" is "more than 50 percent," a lessee must be provided opportunity to present evidence of non-control. *See*, *e.g.*, Revision of Gas Royalty Valuation Regulations and Related Topics, 52 Fed. Reg. 30776-01, 30783 (Aug. 17, 1987) (Minerals Management Service, predecessor to ONRR, recognizing "for purposes of determining whether a contract is arm's-length or non-arm's length, affiliation must be determined on each individual contract"); Revision of Oil Product Valuation Regulations and Related Topics, 53 Fed. Reg. 1184, 1192 (Jan. 15, 1988) (Minerals Management Service, predecessor to ONRR, adopting language for the definition of control implemented at the time by the Bureau of Land Management); Coal Management—General; Coal Management Provisions and Limitations; Oil and Gas Leasing; Leasing of Solid Minerals Other Than Coal and Oil Shale; Amendments to Incorporate Changes Required by Section 2(a)(2)(A) of the Mineral Leasing Act of 1920, 51 Fed. Reg. 43,910, 43,917 (Dec. 5, 1986) (Bureau of Land Management stating, "[T]he Department of the Interior believes it is better, and more reasonable and appropriate, in establishing the criteria to determine control or presumption of control, to look to other Federal statutes, their implementing regulations, and court decisions relating to those statutes and regulations, which have dealt with this issue and have established standards by which to make 'control' determinations," (emphasis added) stating, "[The standards of control]

- 13 -

simply demonstrate the variety of circumstances in which the <u>presumption could be rebutted</u> because 'actual control' will, after scrutiny, be determined to be different than what one presumes upon initial examination" (emphasis added), and stating, "If an entity does not believe that the presumption of control is applicable to it, then it can provide information rebutting the presumption or declaring who, in fact, is in control[, and] again, the <u>presumption of control can be rebutted by submission of evidence</u> that such an entity, in fact, does not have the power to exercise such control" (emphasis added)); *W. Douglas Sellers*, 160 IBLA 377 (2004) (holding Bureau of Land Management's presumption of control as applied to holders and all related parties of an unpatented mining claim was invalid); *Black Bear Mines Co.*, *et al.*, 152 IBLA 387 (2000) (emphasizing an opportunity to present evidence); 17 C.F.R. § 230.405 (Rule and Regulation of Securities Exchange Act of 1934, defining "control" without determinative ownership percentages); 15 U.S.C. § 77o (Securities Act of 1993, defining a "controlling person" without fixed criteria).

47.     Section 152 applies to the valuation of "all gas that is not processed and all gas that is processed but is sold or otherwise disposed of by the lessee pursuant to an arm's-length contract prior to processing." 30 C.F.R. § 1206.152(a)(1).  Valuation of unprocessed gas under Section 152 is governed in relevant part by two distinct provisions.  The first provision, 30 C.F.R. § 1206.152(b), applies to "gas sold under an arm's-length contract."  The second provision, 30 C.F.R. § 1206.152(c), applies to "gas . . . which is not sold pursuant to an arm's-length contract."

48.     By contrast, Section 153 applies to the valuation of "all gas that is processed by the lessee and any other gas production to which this subpart applies and that is not subject to the valuation provisions of § 1206.152 of this part.  This section applies where the lessee's contract

includes a reservation of the right to process the gas and the lessee exercises that right."  30 C.F.R. § 1206.153(a)(1).  Under Section 153, the value of the gas is determined by the combined value of the residue gas and the plant products following processing.  30 C.F.R. § 1206.153(a)(2).  Valuation of processed gas under Section 153 is similarly governed in relevant part by two distinct provisions.  The first provision, 30 C.F.R. § 1206.153(b), applies to "residue gas or any gas plant product sold under an arm's-length contract."  The second provision, Section 153(c), applies to the valuation of "residue gas or any gas plant product which is not sold pursuant to an arm's-length contract."

49.     "The purpose of each of the benchmarks contained in Section 153(c) is to determine what proceeds an arm's-length sale of the processed gas would have generated." *Continental I*, 410 F.Supp.3d at 36.  Where "there is no dispute that the sale of the processed gas was at arm's length, there is no reason to look to proxies to determine what an arm's length sale might have generated."  *Id.*  "[B]oth the language and purpose of Section 153(c) have no bearing on a case . . . where the government contends that the sale of the unprocessed gas to the processer was not at arm's length, but where there is no dispute that the sale of the processed gas was at arm's length."  *Id.*

50.     Regardless whether gas is valued for federal royalty purposes under Section 152 or Section 153, lessees are permitted to deduct transportation allowances.  30 C.F.R. § 1206.156(a) ("ONRR shall allow a deduction for the reasonable actual costs incurred by the lessee to transport unprocessed gas, residue gas, and gas plant products from a lease to a point off the lease including, if appropriate, transportation from the lease to a gas processing plant off the lease and from the plant to a point away from the plant.").  Those transportation allowances are generally determined under 30 C.F.R. § 1206.157.

51.     Where gas is valued for federal royalty purposes under Section 153, lessees are additionally permitted to deduct processing allowances.   30 C.F.R. § 1206.158(a) ("[A] deduction shall be allowed for the reasonable actual costs of processing.").   Those processing allowances are generally determined under 30 C.F.R. § 1206.159.

### AGENCY PROCEEDINGS AND ORDER AND DECISION AT ISSUE

52.     On December 17, 2012, ONRR notified Continental by engagement letter that it was beginning an audit of Continental's royalty payments for production from federal leases in North Dakota, South Dakota, Wyoming, and Oklahoma for the period of January 1, 2009, through December 31, 2012 (the "**Audit Period**").

53.     In advance of the audit engagement letter, ONRR auditors had already begun review of Continental's royalty reporting, noting areas of Continental's onshore production and its royalty payments for oil and natural gas during the Audit Period.

54.     In an audit entrance conference in January 2013, ONRR notified Continental it has already determined "gas sales to Hiland [were] non-arm's-length (NAL)," requesting Continental provide a list of all of Hiland's gas processing plants to which gas produced by Continental was transported and processed.

55.     On May 20, 2015, ONRR issued Continental a Data Request and Preliminary Determination (Request No. DR-032) for the Lease.  The Preliminary Determination identified six issues.

56.     On June 18, 2015, Continental responded to the Data Request and Preliminary Determination, disagreeing with the requirements under law and ONRR's interpretation of existing regulations and requesting ONRR's assistance in retrieving cost data from Hiland, an unaffiliated third party.

57.     On October 28, 2015, Continental and ONRR executed a Tolling Agreement.

58.     During audit, Continental provided ONRR at least three arm's-length contracts for sale of gas in the same area as the Cedar Hills Unit and Lease, where production was processed at a plant nearby the Badlands Plant.  As acknowledged in the Order, ONRR summarily refused to consider these arm's-length agreements as comparable contracts under Section 153(c)(1).  Contrary to ONRR's assertions in the Order, as affirmed by the Decision, Section 153(c)(1) does not limit a demonstration of comparability to only the lessee's purchaser and the same processing in plant but, in fact, allows comparability to be established from "a reasonable sample[] from nearby plants."  *See* 30 C.F.R. § 1206.153(c)(1).

59.      On March 11, 2016, then- ONRR Director issued Continental an Order to Perform Restructured Accounting and Pay Additional Royalties, ordering Continental "to report and pay additional royalties of $45,046.26 for Agreement Number M 90758X and $2,380.45 for Lease Number 284-071447-0," plus interest, and "perform restructured accounting and report and pay any additional royalties."  In contrast with the Order ultimately issued, this March 11, 2016 Order to Perform Restructured Accounting and Pay Additional Royalties permitted Continental to deduct transportation costs based on calculated rates.

60.     On April 11, 2016, Continental wrote a letter to then- ONRR Director, requesting ONRR withdraw or stay the March 11, 2016 Order to Perform Restructured Accounting and Pay Additional Royalties because it lacked supporting documentation and data, thereby rending it erroneous and unenforceable.

61.     On May 9, 2016, ONRR withdrew the March 11, 2016 Order to Perform Restructured Accounting and Pay Additional Royalties.

62.     On May 24, 2016, ONRR issued Continental the new, revised Order, except

ONRR did not correct the errors Continental identified in its April 11, 2016 letter.  In contrast with the March 11, 2016 Order to Perform Restructured Accounting and Pay Additional Royalties, the new, revised Order denied all transportation deductions.

63.     On July 20, 2016, and thereafter, Continental submitted surety instruments to suspend compliance with the Order.

64.     On July 22, 2016, Continental appealed the Order to the Board.  Continental submitted various briefing and exhibits to the ONRR and the Board in support of its appeal.

65.     On July 28, 2016, Continental submitted a request for information under the Freedom of Information Act, 5 U.S.C. § 552, requesting "marketable condition" and actual cost information for gas processing plants owned and/or operated by Hiland.

66.     On September 30, 2016, Continental received a Final Response to its July 28, 2016 request, in which the Department explained "there is no streamlined way to search for these records, resulting in [a] large fee estimate."

67.     On April 24, 2020, the Board issued the Decision, formally dismissing Continental's appeal due to expiration of the 33-month period under 30 U.S.C. § 1724(h).  The Board held, "Because the deadline has passed, the Secretary is deemed to have affirmed ONRR's decision and the Board no longer has jurisdiction over the appeal."

## DEFENDANTS' VIOLATIONS OF LAW

*ONRR Incorrectly Applied Section 151, Incorrectly Determined Continental and Hiland Were Affiliates, and Incorrectly Determined the Faris and Cedar Hills Purchase Contracts Were Non-Arm's-Length.*

68.     *First*, ONRR incorrectly determined Continental and Hiland were affiliates and their sales contracts non-arm's-length under Section 151 throughout the Relevant Time Period. ONRR failed to rely on sufficient evidence to support its finding of affiliation.  ONRR also

misapplied Section 151.  ONRR specifically failed to review and consider whether Continental and Hiland had opposing economic interests.  ONRR also denied Continental an opportunity to present evidence of non-control.

69.     The Order and Decision contravene the meaning of the regulations they purport to apply, violate Due Process Clause of the Fifth Amendment of the United States Constitution, and are otherwise unsupported by the record here.

70.     Prior to and throughout the Relevant Time Period, Continental and Hiland operated as distinct, separate entities – through different Boards of Directors, officers, and employees, and out of different offices with separate accounting systems.  Both entities additionally maintain independent committees to consider and approve or reject any and all proposed transactions, including between the two entities, based on whether the proposed transaction is in the best interests of the respective entity.  As an example, Continental has utilized competitive bidding when considering gas sales transactions and has selected other purchasers' bids over Hiland's bids more often than it has accepted a transaction with Hiland – based on Continental's own best competitive interests.

71.     Hiland is a "midstream energy limited partnership engaged in purchasing, gathering, compressing, dehydrating, treating, processing[,] and marketing of natural gas, and fractionating, or separating, natural gas liquids, or NGLs."

72.     Hiland "[does] not have officers, directors or employees."  Its operations and activities are managed by [its] general partner, Hiland Partners GP, LLC.  "Unitholders do not directly or indirectly participate in [its] management or operation."

73.     As of April 10, 2009, Mr. Harold Hamm owned approximately 72.8% of Continental's outstanding common stock and served as Continental's Chairman of the Board,

Chief Executive Officer, and President.    Mr. Jeffery Hume served as Continental's Chief Operating Officer.

74.    As of September 9, 2009, Mr. Hamm indirectly owned 22.7% of the common stock units issued by Hiland.  Mr. Hamm held a 39.5% ownership interest in Hiland Holdings GP, LP, and Hiland Holdings GP, LP held a 57.5% ownership interest in Hiland.

75.    As of September 11, 2009, Mr. Joseph L. Griffen was Chief Executive Officer and President for Hiland Partners GP, LLC (the general partner of Hiland).  Mr. Matthew S. Harrison was Chief Financial Officer and Vice President of Finance, Mr. Kent Christopherson was Chief Operations Officer and Vice President, and various other individuals including Mr. Hamm served on the eight-member Board of Directors.

76.    As of September 11, 2009, Mr. Bert Mackie was trustee for the Harold Hamm DST Trust and the Harold Hamm HJ Trust.  As trustee, he had "sole voting and dispositive power of the common units in the 'Hiland' entity held by the trusts."

77.    On December 4, 2009, Hiland merged with HLND MergerCo, LLC (the "**Merger**").  Following the Merger, Hiland (the surviving entity) was wholly owned by Hiland Holdings GP, LLC, HH GP Holding, LLC, the Harold Hamm HJ Trust, and the Harold Hamm DST Trust.  Following the Merger, Mr. Hamm's reported indirect beneficial ownership of Hiland was approximately 74%.

78.    Hiland and Hiland Partners GP, LLC (the general partner of Hiland) warranted that, following the Merger, no changes would be made in any organizational or governing documents other than those changes expressly provided for in the Hiland merger agreement.

79.    As of March 31, 2010, Mr. Hamm owned approximately 72.7% of Continental's outstanding common stock.  Mr. Hamm was also Chairman of the Board of Directors and Chief

Executive Officer for Continental.

80.    As of February 16, 2010, Mr. Mackie, as trustee of the irrevocable trusts established for the benefit of Mr. Hamm's children, owned 8.7% of the interest in Continental.

81.    As of March 31, 2011, Mr. Hamm owned approximately 68.1% of Continental's outstanding common stock.  Mr. Hamm was also Chairman of the Board of Directors and Chief Executive Officer for Continental.

82.    As of January 26, 2011, Mr. Mackie, as trustee of the irrevocable trusts established for the benefit of Mr. Hamm's children, owned 8.1% of the interests in Continental.

83.    As of April 17, 2012, Mr. Hamm owned approximately 68.03% of Continental's outstanding common stock.  Mr. Hamm was also Chairman of the Board of Directors and Chief Executive Officer for Continental.

84.    As of April 17, 2012, Mr. Mackie, as trustee of the irrevocable trusts established for the benefit of Mr. Hamm's children, owned 8.11% of the interests in Continental.

85.    Had ONRR properly applied Section 151 for the period of time prior to the Merger, *i.e.*, prior to December 2009, ONRR would have found (i) as a single common director, Mr. Hamm was not in control of Hiland or Continental, (ii) Mr. Hamm's minority interest in Hiland was not indicative of control, (iii) Continental did not operate the relevant plant or any processing facilities, (iv) Mr. Hamm did not participate in Hiland's daily operations, and (v) the record provides no other evidence of control.   Additionally, ONRR would have found Continental and Hiland had opposing economic interests, as demonstrated by the parties' gas purchase contracts and their negotiations.

86.    Had ONRR properly applied Section 151 for the period of time following the Merger, *i.e.*, following December 2009, and specifically provided Continental with an

opportunity to present evidence of non-control, ONRR would have found (i) Hiland Partners GP, LLC (and not Mr. Hamm) controlled Hiland, (ii) two boards of directors sat between Mr. Hamm and Hiland, (iii) operations and day-to-day management of Hiland and Continental remained separate, (iv) Mr. Hamm did not hold a general partnership interest in Hiland, and (v) the record provides no other evidence of control.  Additionally, ONRR would have found Continental and Hiland had opposing economic interests, as demonstrated by the parties' gas purchase contracts and their negotiations.

*ONRR Incorrectly Valued Continental's Production under Section 153(c)*
*and Incorrectly Applied Section 153(c)*

87.     *Second*, ONRR incorrectly determined Continental must value its unprocessed gas production and sales from the Properties throughout the Relevant Time Period by using the processed gas valuation benchmarks under Section 153(c), specifically Section 153(c)(2). ONRR misapplied Section 153(c).  ONRR also specifically failed to review and consider Continental's submission of comparable contracts relevant to Section 153(c)(1).

88.     The Order and Decision contravene the plain and unambiguous meaning of the regulations they purport to apply, violate Due Process Clause of the Fifth Amendment of the United States Constitution, and are otherwise unsupported by the record here.

89.     It is plain on its face that Section 153(c) cannot apply to Continental's sales to Hiland because Section 153(c) applies to "residue gas or any gas plant product which is not sold pursuant to an arm's-length contract."

90.     The record shows Continental did not sell residue gas or gas plant products from the Properties during the Relevant Time Period.  Continental sold gas to Hiland still in unprocessed form.

91.     The record also shows Hiland sold residue gas and gas plant products at arm's-length. Specifically, relevant to the Cedar Hills Unit and the Faris USA 1 well from the Lease, Hiland processed the gas it purchased from Continental during the Relevant Time Period (and from other producers) and sold the residue gas and plant products at arm's-length to Rainbow Gas Company and SemStream, L.P.

92.     ONRR's application of Section 153(c) to Continental's sales of unprocessed gas here is contrary to law. *Continental I*, 410 F.Supp.3d at 35-36.

93.     ONRR's rationale that Section 153(c) applies is unlawful, arbitrary, and capricious. ONRR may not simply ignore the plain text of its own regulations. *See, e.g.*, *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 673 (D.C. Cir. 2003).

94.     ONRR also may not modify its regulations by interpreting them in ways that run directly contrary to their plain meaning. "Unprocessed gas" is not "residue gas and gas plant products" – and indeed is the opposite of it. An agency cannot "correctly" interpret a term to be its antonym – here, interpreting *unprocessed* gas to mean *processed* gas products.

95.     If ONRR wishes to apply the valuation methodology set out in Section 153(c) to non-arm's-length sales of gas that is subsequently processed and sold at arm's-length, it may do so only through notice-and-comment rulemaking. Indeed, ONRR did just that in 2016. *See Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform*, 81 Fed. Reg. 43,338 (July 1, 2016) (the "**2016 Valuation Rule**"). The 2016 Valuation Rule applies to production from January 1, 2017, forward. *Id.* ONRR may not apply the 2016 Valuation Rule retroactively to the Relevant Time Period.

96.     Principles of deference also cannot save ONRR's "interpretation" of its regulations because Section 153(c) unambiguously does not apply here. *See*, *e.g.*, *Continental*

*I*, 410 F.Supp.3d at 35; *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 [131 S.Ct. 871, 880] (2011) (*Auer* deference does not apply when an agency's interpretation is "plainly erroneous or inconsistent with the regulation." (citation omitted)).

97.     Deference also should not apply, as ONRR has failed to give fair notice of its interpretation, it has not consistently interpreted its regulations, and "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citation omitted).

98.     In addition, ONRR's actions violate Continental's due process rights.  It is a "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  ONRR's interpretation cannot satisfy that standard.  Without any guidance or prior decisions that could provide fair notice, ONRR applied a provision – Section 153(c) – that by its terms plainly does not apply.

99.     Even assuming *arguendo* Section 153(c) could apply to Continental's sales to Hiland, ONRR also arbitrarily and capriciously refused to consider comparable contracts provided by Continental during audit in support of its compliance with Section 153(c)(1).

### ONRR Incorrectly Issued the Order and Denied Continental Access to Actual Cost Information

100.     *Third*, ONRR incorrectly and untimely issued Continental the Order.  ONRR misapplied 30 U.S.C. §§ 1702, 1724.  Defendants are barred from pursuing all Corrective Actions and all Issues identified in the Order, as affirmed by the Decision, that concern obligations arising before May 25, 2009.  ONRR also failed to assert a "specific, definite, and

quantified obligation" by "lease, production month, and monetary amount" and specifically failed to provide "reasons" and "a reasonable basis." At most except for Corrective Action No. 1 in the Order, Defendants are further barred from pursuing any Corrective Action or Issue identified in the Order. ONRR also failed to (i) specifically identify any systemic, reporting error and (ii) specify reasons and factual bases for obligations claimed in the Order. At most, except for the claim that Continental and Hiland were affiliates prior to the Merger (thereby rendering their transactions non-arm's-length), the Order does not toll (or extend) the seven-year statute of limitations.

101.    In addition, ONRR specifically failed to present any factual basis for a determination that Continental violated the marketable condition rule, thereby resulting in a denial of all transportation and processing allowances in contravention of 30 C.F.R. §§ 1206.156(a) ("ONRR shall allow a deduction for the reasonable actual costs incurred by the lessee[.]"), 1206.158(a) ("[A] deduction shall be allowed for the reasonable actual costs of processing."). ONRR specifically failed to identify what transportation and processing costs it claimed were improperly netted, what "bundled transportation fees" the Order referred to, what costs the Order disallowed, what "market" or "condition requirements" Continental was required to meet, among other deficiencies. ONRR arbitrarily and capriciously disallowed categories of costs as *per se* needed to make production marketable without review of relevant evidence.

102.    The Order and Decision contravene the plain and unambiguous meaning of the regulations they purport to apply, violate Due Process Clause of the Fifth Amendment of the United States Constitution, and are otherwise unsupported by the record here.

103.    ONRR ordered Continental to calculation transportation and processing allowances based on actual costs Hiland incurred to transport and process the gas, even though

ONRR knows Continental lacks access to that information.

104.    Continental has attempted to obtain from Hiland a cost breakdown for the services provided, but Hiland (through its parent Kinder Morgan) has declined to produce that information, and Continental has no legal mechanism to compel Hiland or Kinder Morgan to divulge the information.

105.    On July 16, 2015, Continental wrote to Kinder Morgan, requesting information and data for the Badlands Plant from July 2009 through July 2015 and for Hiland's Oklahoma Eagle Chief Plant for January 2009 through September 2012 in order to comply with certain preliminary determinations and data requests received from ONRR.  Continental requested the transportation allowance rate for gas, the transportation allowance rate for plant products, and the processing allowance per unit – based on actual costs per plant system.  Continental requested itemized capital costs, operating expenses, maintenance expenses, and overhead expenses for each plant as well as volumes associated with the plant system allowances.  Continental did not receive any response from Kinder Morgan.

106.    On August 19, 2015, Continental again requested the same information from Kinder Morgan.  On August 21, 2015, a company representative from Kinder Morgan responded:  "Kinder Morgan, Hiland Partners, LP prior to February 23, 2015, has all of the information requested by ONRR. Hiland Partners, LP has never provided any information of this kind to Continental Resources, Inc. and will not provide like kind or similar information to them in the future. In that regards, Continental Resources would be unable to provide any of the information requested by ONRR."

107.    ONRR possesses the information Continental requires in order to comply with the Order and Decision.

108.    In a July 8, 2015 data request to Continental, ONRR stated, "[W]e're requesting data from Kinder Morgan that we require to complete our verification of CLR's royalty reports, specifically the transportation and processing allowances to which CLR is entitled."  ONRR requested Kinder Morgan provide actual cost data for the Eagle Chief and Badlands Plants for January 2009, May 2010, December 2011, and September 2012.  ONRR specifically sought "itemized capital costs, operating expenses, maintenance expenses, and overhead expense for both gas plants" from the transportation and processing/system data, citing 30 C.F.R. §§ 1206.157(b)(2), 1206.159(b)(2).

109.    On August 12, 2015, Kinder Morgan submitted a response to the ONRR's July 8, 2015 data request but did not provide a copy to Continental.  This response included transportation costs for the Eagle Chief and Badlands Plants, depreciation numbers, detail of general and administrative costs, compressor expenses, and operating expenses.

110.    Continental has been denied access to actual cost information needed to understand and comply with the Order and Decision.  ONRR knows midstream service providers and contract counter-parties will not produce such actual cost information.  ONRR has repeatedly admitted this fact to lessees in public fora, and ONRR has thus undertaken an extensive project to subpoena information from midstream companies and contract counter-parties, so that the agency may discern the actual costs of transportation and processing.  It is the essence of arbitrariness to expect a regulated entity to do what the agency knows is impossible. *Messina v. U.S. Citizenship & Immigration Servs.*, Case No. Civ.A. 05-CV-73409-DT, 2006 WL 374564, at *6 (E.D. Mich. Feb. 16, 2006); *see RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs.,* 467 F. Supp. 2d 285, 305 (E.D.N.Y. 2006).

**COUNT I**

<u>**VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT**</u>
<u>**AGAINST ALL DEFENDANTS**</u>

111.   Continental repeats and re-alleges the allegations in the preceding paragraphs, as if fully set forth herein.

112.   Defendants have violated the APA, 5 U.S.C. § 706(1), by unlawfully withholding and unreasonably delaying adherence with the Court's holdings in *Continental I and II*, as applied to the Order and Decision.   The Order and Decision are arbitrary, capricious, and otherwise not in accordance with law.

113.   Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order and Decision arbitrarily, capriciously, and otherwise unlawfully require Continental to value its unprocessed gas production from the Properties under Section 153(c), specifically Section 153(c)(2), throughout the Relevant Time Period.   ONRR misapplied Sections 151, 152, and 153 under the record here in contravention of the regulations' plain language and without adequate rationale.

114.   Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because ONRR arbitrarily and capriciously refused to review available evidence supporting Continental's compliance with Section 153(c)(1), thereby denying Continental constitutional right, power, and privilege, and acting without observance of procedure by law.

115.   Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order and Decision arbitrarily and capriciously depart from ONRR's prior audit and acceptance of Continental's royalty calculations under Section 152 without adequate explanation.

116.   Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the

Order and Decision substantially depart from the Department's prior interpretation of its regulations without notice-and-comment rulemaking. *See Fina Oil*, 332 F.3d at 676 ("[T]o prevent agencies from circumventing the notice-and-comment process by rewriting regulations under the guise of interpreting them, we will reject an agency interpretation that is 'plainly erroneous or inconsistent with the regulation.'" (citation omitted)).

117.    Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order and Decision, inclusive of Defendants' actions during audit and the administrative appeals process, are contrary to constitutional right, power, and privilege – specifically the Due Process Clause of the Fifth Amendment to the United States Constitution.

118.    Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order, as affirmed by the Decision, was untimely and improperly issued in excess of statutory jurisdiction, authority, or limitations, short of statutory right, and without observance of procedure required by law under 30 U.S.C. §§ 1702, 1724.

119.    Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order and Decision are unsupported by the record. Specifically, the record does not support a finding or conclusion that Continental and Hiland transacted at non-arm's-length under Section 151 throughout the Relevant Time Period. ONRR misapplied Sections 151, 152, and 153 based on the record here.

120.    Defendants have additionally violated the APA, 5 U.S.C. § 706(2), because the Order and Decision are further unsupported by the record. Specifically, the record does not support a finding or conclusion that Continental incorrectly calculated and/or reported costs or allowances from the Cedar Hills Unit or Lease during the Relevant Time Period. ONRR misapplied 30 C.F.R. §§ 1206.156, 1206.157, 1206.158, 1206.159 based on the record here.

## COUNT II

### VIOLATIONS OF THE MINERAL LEASING ACT
### AGAINST ALL DEFENDANTS

121.    Continental repeats and re-alleges the allegations of the preceding paragraphs, as if fully set forth herein.

122.    The Order and Decision violate the Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*, because they fail to determine royalties based on the "value of production." 30 U.S.C. § 226.

## COUNT III

### VIOLATIONS OF FITH AMENDMENT DUE PROCESS CLAUSE
### AGAINST ALL DEFENDANTS

123.    Continental repeats and re-alleges the allegations of preceding paragraphs, as if fully set forth herein.

124.    The Order and Decision violate Continental's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution because ONRR failed to provide fair notice of its counter-textual interpretation of the valuation regulations.

125.    The Order and Decision violate Continental's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution because ONRR denied Continental access to the very information it requires in order to understand the Order and Decision.

126.    The Order and Decision violate Continental's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution because ONRR denied Continental access to the very information it requires in order to comply with the Order and Decision and prove its "actual costs of transportation" and "actual costs of processing."

## PRAYER FOR RELIEF

WHEREFORE, Continental prays the Court:

1.     Grant injunctive relief compelling Defendants to withdraw and/or reconsider the Order and Decision in specific adherence with the holdings in *Continental Resources, Inc. v. Gould*, Case No. 1:14-cv-00065-RDM [Doc. 93], 410 F.Supp.3d 30 (D.D.C. Oct. 3, 2019) and *Continental Resources, Inc. v. Bernhardt, et al.*, Case No. 1:17-cv-02197-RDM [Doc. 58] (D.D.C. Oct. 3, 2019), which declared application of Section 153(c) contrary to law as applied to Continental's unprocessed gas production;

2.     Hold unlawful, reverse, vacate, and/or set aside the Order and Decision as: arbitrary, capricious, and abuse of discretion, and/or otherwise not in accordance with law; contrary to constitutional right, power, and/or privilege; excessive of statutory jurisdiction, authority, or limitations, and/or short of statutory right; without observance of procedure required by law; and/or unsupported by substantial evidence.

3.     Enter declaratory judgment that the Order and Decision are unlawful, that Defendants unlawfully applied Section 153(c) to the relevant gas production at issue, and that such production must instead be valued under Section 152 or, in the alternative, 30 C.F.R. § 1206.153(h) or 30 C.F.R. § 1206.153(j);

4.     Enter declaratory judgment that the Order and Decision are unlawful, that Defendants unlawfully denied allowances, and that Continental may retain allowances previously calculated;

5.     Award Continental costs and attorneys' fees to the extent permitted by law; and

6.     Grant such other relief as may be appropriate in the circumstances.


Respectfully submitted this 2nd day of July, 2020.

BAKER & HOSTETLER LLP

*/s/ Rosario C. Doriott Domínguez*
L. Poe Leggette
Rosario C. Doriott Domínguez
Laura E. Peterson
pleggette@bakerlaw.com
rdoriottdominguez@bakerlaw.com
lpeterson@bakerlaw.com
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
Telephone: 303.861.0600
Facsimile: 303.861.7805

*Attorneys for Plaintiff Continental Resources, Inc.*